INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al., Petitioners,

v.

GENERAL DYNAMICS LAND
SYSTEMS DIVISION,
Respondent.

William E. BROCK, Secretary of
Labor, Petitioner,

v.

GENERAL DYNAMICS LAND
SYSTEMS DIVISION, et al.,
Respondents.

Nos. 85–1760, 85–1826.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 17, 1986.

Decided April 14, 1987.

Andrea C. Casson, Asst. Counsel, Dept. of Labor, with whom Joseph M. Woodward, Counsel, Dept. of Labor, Washington, D.C., was on brief, for petitioner Brock in No. 85–1826.

Jordan Rossen, Ralph O. Jones, and Beverly Tucker, Detroit, Mich., were on brief, for petitioners Intern. Union, et al., in No. 85–1760.

John P. Hancock, Jr., Detroit, Mich., for respondents General Dynamics Land Systems Div. Inc., et al.

Before STARR and BUCKLEY, Circuit Judges, and AUBREY E. ROBINSON, Jr.,* Chief Judge, United States District Court for the District of Columbia.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The Occupational Safety and Health Administration ("OSHA") cited General Dynamics Land Systems Division ("General Dynamics" or the "Company") for workplace violations of a statute and of administrative safety standards. An administrative law judge ("ALJ") found that as General Dynamics conformed with the safety standards, it could not be found to have violated the statutory requirement. The Occupational Safety and Health Review Commission (the "Commission") adopted the ALJ's decision as its own. Petitioners urge us to vacate the order insofar as it holds that a specific OSHA safety standard preempts enforcement of a general statutory duty to assure workplace safety. We vacate the challenged portion of the order and hold that, in the circumstances of this case, an employer's compliance with OSHA's standards will not discharge his statutory obligation to provide employees with safeguards against recognized hazards.

## I. BACKGROUND

General Dynamics manufactures M–1 Abrams tanks in a Department of Defense facility called the Detroit Arsenal Tank Plant ("Plant"). Abrams tanks have internal hydraulic systems that sometimes leak during assembly. For several months prior to November 1983, General Dynamics employees had used a solvent called 1,1,2 trichloro 1,2,2 trifluoroethane ("solvent" or "freon") to clean up resulting oil spills. The solvent evaporates quickly. While it is less toxic than other commercial solvents, in its gaseous state it is heavier than air and may cause serious illness or death. It tends to accumulate in assembly-line pits and tank hulls, displacing oxygen and creating a risk of asphyxiation. In high concentrations it may also cause cardiac arrythmia and eventual arrest. *See* Brief for Petitioners International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW and its Local 1200 ("UAW") at 4; Brief for Petitioner Secretary of Labor ("Secretary") at 10–11.

According to the UAW, General Dynamics stored the solvent at the Plant in fifty-five-gallon drums "with no limit on the amount that could be obtained until November 15, 1983 when its use was discontinued throughout the plant." Brief for UAW at 4. During the period it was in use, the solvent was available in several areas of the Plant. *Id.* Employees in the

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1982).

Tank-Hull Assembly Department, for example, used the solvent in cup-sized quantities to clean spills of up to half a pint of oil. *Id.* at 5. To clean larger spills of up to ten or fifteen gallons of hydraulic fluid, however, "employees would use [gallon-sized] buckets or 2½ gallon spray containers to apply solvent to the affected area." *Id.* This procedure would consist of "dumping gallons of the solvent into the hull where it would evaporate or exit through a drain on the floor." *Id.* Sometimes employees would enter a hull still containing liquid solvent and oil to vacuum them out. Employees would also use the solvent in large quantities in the Plant's Heavy Repair Department. *Id.* at 9.

General Dynamics does not reject petitioners' description of cleaning procedures at the Plant. *See* Brief for General Dynamics at 2–29 (statement of facts). Rather, it explains that "[t]he manner in which 'tank repairmen' ... performed the various repairs was essentially a matter of the team's discretion because all tank repairmen were highly skilled...." *Id.* at 17. Such discretion was subject, however, to the requirement that tank hulls be ventilated when employees used solvent in quantities larger than one pint. *Id.* Its safety officers conducted training sessions with employees to "describe[ ] the potential hazards associated with use of the solvent, and stated that employees should try to restrict the quantities used and also use ventilation whenever more than 1 pint was used inside a fully assembled tank." *Id.* at 12.

The incidents leading to this litigation began shortly after the Company commenced production of the M–1 tank in March 1982. Brief for Secretary at 7. A Plant employee was overcome by fumes in August 1982 after entering an assembly-line pit containing freon vapors. *Id.* at 11. After an inspection, OSHA issued a citation authorized by section 9 of the Occupational Safety and Health Act of 1970 (the "Act"), 29 U.S.C. § 658 (1982). The citation charged General Dynamics with violations of section 5(a) of the Act, 29 U.S.C. § 654(a) (1982), which provides:

Each employer—

(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

(2) shall comply with occupational safety and health standards promulgated under this chapter.

Specifically, General Dynamics was charged with a violation of its statutory duty to provide safe working conditions under subsection 5(a)(1) ("general duty clause") and to observe safety standards issued pursuant to subsection 5(a)(2) ("safety standards" or "specific standards"). General Dynamics reached a settlement with OSHA in June 1983 in which the Company affirmed that it had implemented amended confined-space procedures and agreed that "in the future [it] will in good faith continue to comply[ ] with the provisions of the Act, *and* applicable standards promulgated pursuant thereto." Joint Appendix ("J.A.") at 964 (emphasis added).

In March 1983, another Plant employee became dizzy and weak after driving a fully assembled tank. Brief for Secretary at 12. As a result of this incident, General Dynamics posted a safety bulletin at the Plant that read in part:

[Trichloro trifluoroethane] vapors being 6½ times heavier than air will readily displace oxygen in pits and enclosed spaces such as the inside of tracked vehicles. Ventilation must be utilized when this solvent is used in enclosed spaces, otherwise its use must be limited to one pint quantities.

General Dynamics Land Systems Division Safety Bulletin ¶ 4 (April 1983); J.A. at 1006.

Again on July 9, 1983, a General Dynamics employee from another plant, Frederick Spearing, became seriously ill at the Plant's test track while sitting inside the driver's compartment of a tank. He remained in that position while two employees poured several gallons of solvent onto the floor of the tank. Moreover, to clear an opening for the solvent to enter, employees rotated the tank's turret in such a

manner that it blocked the only exit from the compartment where Mr. Spearing was sitting. He lost consciousness in the presence of a supervisor. J.A. at 367–70; Brief for Secretary at 14–15. The relevant General Dynamics injury report ascribed the injury "to inhalation of fumes from Genesolv D (trichloro-trifluoroethane)." Supervisors Report of Accident (July 11, 1983); J.A. at 971.

In yet a third incident on September 21, 1983, Plant employee Charles Paling also suffered from exposure to solvent fumes. After entering a tank and pouring approximately two gallons of solvent to clean a hydraulic leak, Paling exited and used a portable device to ventilate the tank. This was in apparent compliance with the ventilation requirement in the safety bulletin that was issued following the incident of March 1983. Paling then re-entered the tank. Another employee later discovered him inside the driver's compartment shaking and foaming from the mouth. Brief for UAW at 10–11; Brief for Secretary at 16; see J.A. at 299–314, 343–48.

As it had done before, the UAW complained to OSHA about the Paling incident. While OSHA conducted an investigation, a General Dynamics employee at a different plant died from exposure to solvent fumes. Brief for Secretary at 12 n. 8; J.A. at 719. Shortly thereafter, on November 29, 1983, OSHA cited General Dynamics for violations of section 5(a)(1) of the Act ("statutory charge"), and of OSHA's specific standard for governing an employee's exposure to the solvent, 29 C.F.R. § 1910. 1000(a)(2) & (e). OSHA sought penalties totalling $18,000.

The statutory charge stated that General Dynamics had violated section 5(a)(1) because it "did not furnish employment and a place of employment which were free from recognized hazards" associated with exposure to solvent vapors in confined spaces requiring special entry procedures. Citation at 1; J.A. at 7. General Dynamics contested this citation, and the matter was referred to the ALJ. After hearing evidence for eighteen days, he determined, as a matter of law, that "the circumstances of

this case are governed solely by the regulations at 29 C.F.R. § 1910.1000(a)–(d) which set forth the limits of employee exposure to trichloro trifluoroethane." ALJ decision at 12; J.A. at 119. Subsection (a) provides that employers must not expose employees to a time-weighted average of more than 1,000 parts per million of trichloro trifluoroethane vapors during any eight-hour work shift of a forty-hour work week. 29 C.F.R. § 1910.1000(a) (the "freon standard"). The freon standard calculates the concentration of solvent vapors by volume at a given temperature and pressure.

The ALJ reasoned that "a ruling upon consideration of all the evidence will not be made as the allegations of the [section 5(a)(1)] violation are inappropriate and must be vacated because the alleged hazard is *addressed by* a specific standard." Order at 9–10; J.A. at 116–17 (emphasis added). In support of this conclusion he cited (1) the legislative history of the Act and its general policy aims, (2) a rule of statutory construction that the "specific takes precedence over the general," and (3) OSHA's preemption regulation in 29 C.F.R. § 1910.5(c)(1) as interpreted by the Commission. The ALJ also held that "the Secretary failed to meet his burden in proving the violation" of the freon standard, and that the evidence offered "is not convincing that [the employee's] exposure was in excess of the permissible level according to the standard." ALJ decision at 20–21; J.A. at 127–28.

The ALJ's decision and order became a final order of the Commission by virtue of the failure of any commissioner to direct internal review within thirty days. See 29 U.S.C. § 661(j) (1982). The UAW filed a petition for review in this court. The Secretary first proceeded in the United States Court of Appeals for the Eighth Circuit, but his petition was transferred to this court and consolidated with that of the UAW. General Dynamics responds to both petitions, and the Commission responds only to the Secretary's petition.

Petitioners do not challenge the ALJ's conclusion that General Dynamics did not violate the freon standard. They both ar-

gue, however, that the ALJ erred in vacating that part of the citation charging a violation of the general duty clause. They contend that OSHA's standard for trichloro trifluoroethane defines a narrow set, and the general duty clause a larger set, of unsafe workplace conditions. The relationship between these sets is the crux of the dispute. Petitioners argue that the hazards cited at the Plant extend beyond those addressed by the freon standard, and that an employer's compliance with that standard is not a substitute for compliance with the general duty imposed by section 5(a)(1). They also maintain that the court should defer to the Secretary's construction of OSHA regulations. Finally, the Secretary contends that the challenged portion of the final order represents an unexplained departure from Commission precedent.

General Dynamics responds that the hazards at issue are within the scope of the freon standard, that its compliance with that standard relieves it of any responsibility for the alleged violations under the general duty clause, that OSHA's regulations so require, and that the ALJ's interpretation of these regulations is not unreasonable and deserves deference. The Company also argues that the final order does not ignore Commission precedent.

We conclude that the Commission erred in its construction of OSHA's regulations because it misunderstood the structure of the Act that authorizes the regulations. We also conclude that the Commission acted arbitrarily and capriciously in refusing to follow its own precedent.

## II. DISCUSSION

### A. *The Nature of the Inquiry*

The issue before us is whether, as a matter of law, the Company's compliance with the freon standard relieved it of responsibility for alleged violations of the statute's general duty clause. This raises two fundamental principles. The first concerns the power of an agency to make law. Without such power OSHA could not prescribe a regulation that preempts an otherwise applicable statutory provision. The second concerns the relationship between such agency-made law and statutory law. Treaties aside, the Supremacy Clause provides that a federal statute must always be superior to all other forms of law, including regulations. U.S. Const. art. VI.

These principles are implicated in the issue before us because OSHA's freon standard could preempt section 5(a)(1) only if Congress, the repository of all legislative power, U.S. Const. art. I, § 1, and supreme lawmaker, U.S. Const. art. VI, permitted it. Because Congress may delegate its legislative power, *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 865–66, 104 S.Ct. 2778, 2781–82, 2792–93, 81 L.Ed.2d 694 (1984), the question in this case is whether OSHA has been delegated the power to issue regulations preempting an employer's duty under section 5(a)(1).

Neither petitioners nor General Dynamics approach this case as one directly involving a delegation issue. The Secretary relies entirely on his own regulation at 29 C.F.R. § 1910.5(f), and dictum in a decision of this court, *National Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1261 n. 9 (D.C.Cir.1973), for the proposition that section 5(a)(1) "does not apply with respect to any 'condition ...' covered by the [OSHA] standard." Brief for Secretary at 21. The UAW agrees that "to preempt a general duty clause citation a specific standard must address the particular hazard cited under the general duty clause," Brief for UAW at 23, and refers to the inapposite holding of *L.R. Wilson and Sons v. OSHRC*, 698 F.2d 507, 511 (D.C.Cir.1983) (concerning preemption of a general *regulatory* standard). Brief for UAW at 21. Rather than questioning the Commission's apparent premise that a specific standard will be given preemptive effect even when an employer knows it to be inadequate, petitioners rely instead on their argument that the hazard alleged in the statutory charge is distinguishable from that to which the specific standard is addressed. Nevertheless, as all the parties accept that premise, we believe it necessary to place it in proper focus.

We cannot address the relationship between section 5(a)(1) and the regulations issued under section 6 without turning at the outset to the statutory basis for those regulations. Neither can we decide whether the Secretary or the Commission deserves our deference without reference to what Congress has said on the matter.

We consider first whether the ALJ's analysis of the legislative history and policy of the Act, and his invocation of a rule of statutory construction, identify any congressional delegation of authority to preempt a duty under section 5(a)(1) with a specific standard. We then examine the effect of OSHA's preemption regulations. Subsequently we consider concretely the role of section 5(a)(1) in this case as it relates to section 5(a)(2). We end with the Secretary's argument that the final order is in violation of Commission precedent.

## B. *Preemptive Effect of the OSHA Standard*

The Commission's adjudicative duties are distinct from OSHA's rulemaking function. *Compare* 29 U.S.C. § 655 (1982) (Secretary's authority to promulgate standards) *with* § 661(j) (1982) (Commission's adjudicative duties). There is no challenge before us to any OSHA regulation, but rather a challenge to the Commission's interpretation of particular OSHA regulations.

The Secretary argues that, "contrary to General Dynamics' unsupported assertion, section 1910.1000 was never intended to comprehensively cover all possible hazards or protective measures that could be associated with exposure to any of the numerous substances listed in the standard," and that General Dynamics' argument "would defeat Congress' clear intent." Reply Brief for Secretary at 6–7. For guidance in this matter, we turn to *Chevron*. There the Supreme Court held that where a statute entrusted to an agency for administration is unclear, federal courts must defer to the agency's "permissible construction." 467 U.S. at 844–45, 104 S.Ct. at 2782–83. In the course of reaching its holding, the *Chevron* Court set out the approach feder-

al courts must take when interpreting statutes:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, ... the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842–43, 104 S.Ct. at 2781–82 (citations omitted).

The Supreme Court recently reemphasized the dispositive effect of statutory language whose meaning is unmistakable. In *Board of Governors of the Fed. Reserve Sys. v. Dimension Financial Corp.*, 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986), the Court unanimously held (without Justice White's participation) that the Board of Governors lacked the authority to regulate "nonbank banks" because "[i]f the statute is clear and unambiguous, 'that is the end of the matter, for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Id.* 106 S.Ct. at 686 (quoting dictum in *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781).

Applying this approach, our inquiry stops at the first step. Although some will find ambiguity even in a "No Smoking" sign, we find none in the language before us. Because we find the language clear, we do not reach the issue of deference. Section 5(a)(1) clearly and unambiguously imposes on an employer a general duty to provide for the safety of his employees that is distinct and separate from the employer's duty, under section 5(a)(2), to comply with administrative safety standards promulgated under section 6 of the Act. Therefore, unless we find this interpretation in conflict with another source of statutory law, we are bound to reject any agency interpretation that is inconsistent with

what we find to be the plain meaning of section 5(a).

Neither the Commission nor General Dynamics has cited such a source, and we have found none. The best the ALJ is able to do is cite the "declared purpose of the Act" as reflected in a sentence from a Senate committee report. *See* Final Order at 10, J.A. at 117. An appeal to legislative history is unavailing, however, where the meaning of a statute is manifest. As the Court noted in *Dimension,*

> the final language of the legislation may reflect hard fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

106 S.Ct. at 689.

The ALJ's opinion also refers to the general principle of statutory construction that the specific takes precedence over the general as a basis for preemption. General Dynamics urges us to accept this reasoning, noting that the principle is contained in the maxim *expressio unius est exclusio alterius.* Brief for Respondent General Dynamics at 59–60 (citing *S & H Riggers and Erectors, Inc. v. OSHRC,* 659 F.2d 1273, 1280 n. 9 (5th Cir.1981) ("[A]n employer might, consistently with the principle *expressio unius est exclusio alterius,* conclude that the variety of regulations requiring safety belts in specific situations represented an exclusive listing of the circumstances in which safety belts are required rather than indicating a general need for safety belts for all employees working at heights.") (dictum)). First, this maxim can apply only if we assume *a priori* that the specific standard is exclusive of the general duty of the Act. More important, however, we cannot defeat clear and unambiguous statutory language with a Latin maxim anymore than we can with legislative history.

█ We conclude that the Act does not empower the Secretary, and hence OSHA, to absolve employers who observe specific standards from duties otherwise imposed on them by the general duty clause. To the degree that the final order makes such a claim, it is in error.

## C. *Preemption Regulations*

The final order also relies on an OSHA preemption regulation, 29 C.F.R. § 1910.-5(c)(1), which General Dynamics here supplements with another, namely, 29 C.F.R. § 1910.5(f). Section 1910.5(c)(1) provides:

> if a particular standard is specifically applicable to a condition, practice, means, method, operation, or process, it shall prevail over any different general standard which might otherwise be applicable to the same condition, practice, means, method, operation, or process....

Section 1910.5(f) provides:

> an employer who is in compliance with any standard in this part shall be deemed to be in compliance with the requirement of section 5(a)(1) of the Act, but only to the extent of the condition, practice, means, method, operation, or process covered by the standard.

First we note that the application of section 1910.5(c)(1) to this case is less than obvious. The regulation does not refer to section 5(a)(1), and its reference to an otherwise applicable general standard has no necessary relationship to a statutory duty to protect employees from a recognized hazard. Although the Commission has applied the principle incorporated in section 1910.5(c)(1) in support of a decision setting aside a citation for a violation of the general duty clause, *Brisk Waterproofing Co.,* 73 OSAHRC 30/E1, 1 BNA OSHC 1263, 1973–74 CCH OSHD ¶ 15,392 (No. 1046, 1973), the language used in the case would more appropriately apply to section 1910.-5(f), the regulation cited by General Dynamics in justifying its claim of preemption. While we believe that section 1910.-5(f) may be read merely to prohibit a double penalty for an employer who has violated a safety standard, that is to say, one penalty under the safety standard and the other under the general duty clause, we now consider whether the Company's broader reading of this regulation is authorized by Congress.

Both preemption regulations were promulgated pursuant to OSHA's authority under section 6 of the Act, 29 U.S.C. § 655 (1982). Section 6 authorizes the Secretary to promulgate safety standards. It nowhere suggests that the Secretary may promulgate standards that displace the general duty imposed by section 5(a)(1). When we compare the lack of statutory support for the construction of sections 1910.5(c)(1) and (f) that the Commission and General Dynamics reach, and the clear and unambiguous language of the general duty clause, there is no contest. On the facts in this case, section 5(a)(1) can no more be denied legal effect on the basis of OSHA's preemption regulations than it can on the basis of its specific standard.

### D. *The Role of Section 5(a)(1)*

Any apparent conflict between section 5(a)(2) or the preemption regulations on the one hand, and the general duty clause on the other, is resolved when one focuses on the words "recognized hazard" in section 5(a)(1). As the Commission has pointed out in *Con Agra, Inc., McMillan Co. Division,* 1983–84 O.S.H. Dec. (CCH) ¶ 26,420, at 33,-523 (1983):

> In order to establish a section 5(a)(1) violation, the Secretary must prove: (1) the employer failed to render its workplace free of a hazard, (2) *the hazard was recognized* either *by the cited employer* or generally within the employer's industry, (3) the hazard was causing or likely to cause death or serious physical harm, and (4) there was a feasible means by which the employer could have eliminated or materially reduced the hazard.

*Id.* at 33,526 (citations omitted) (emphasis added).

■ This analysis emphasizes the fact that the duty to protect employees is imposed on the employer, and the hazards against which he has the obligation to protect necessarily include those of which he has specific knowledge. Therefore if (as is alleged in this case) an employer knows a particular safety standard is inadequate to protect his workers against the specific hazard it is intended to address, or that the conditions in his place of employment are such that the safety standard will not adequately deal with the hazards to which his employees are exposed, he has a duty under section 5(a)(1) to take whatever measures may be required by the Act, over and above those mandated by the safety standard, to safeguard his workers. In sum, if an employer knows that a specific standard will not protect his workers against a particular hazard, his duty under section 5(a)(1) will not be discharged no matter how faithfully he observes that standard. Scienter is the key.

■ By the same token, absent such knowledge, an employer may rely on his compliance with a safety standard to absolve him from liability for any injury actually suffered by employees as a consequence of a hazard the standard was intended to address, and he will be deemed to have met his obligation under the general duty clause with respect thereto. In other words, compliance with a safety standard will not relieve an employer of his duty under section 5(a)(1); rather, it satisfies that duty. It is in this sense that it may be said that an OSHA standard preempts obligations under the general duty clause.

Thus a decision in the case at hand depends on the following factual determinations: Is the hazard alleged in the statutory charge accurately described? If so, is it adequately addressed by the freon standard? And if it is not, did General Dynamics have knowledge of the fact and take appropriate measures to mitigate the hazard? We do not have the answers because, having decided that "the allegations of the violation [of the general duty clause] are inappropriate and must be vacated because the alleged hazard is addressed by a specific standard," ALJ decision at 10, J.A. at 117, the ALJ declined to address the basic questions. Although General Dynamics recognized that certain uses of the solvent inside tracked vehicles could cause serious harm to employees, J.A. at 1006, the ALJ has not determined whether it believed that its observance of the freon standard was sufficient to protect them from that harm.

One thing we can conclude is that the hazard alleged in the statutory charge is distinguishable from that addressed by the freon standard. The hazard is described as follows:

Employees working in the Heavy Repair, Test and Adjust, Marriage, M–1 Hull Line, and Engine Test areas were required to spray or pour varying quantities of 1,1,2 trichloro 1,2,2 trifluoroethane into the turret, driver's, and engine compartments of M–1 tanks and immediately enter these compartments to perform clean-up and other routine tasks thereby exposing themselves to the hazard of asphyxiation and/or chemical poisoning. A confined space entry procedure, specific for these operations, had not been implemented when toxic compounds were introduced into the vehicles.

Citation at 1; J.A. at 7. The citation also lists the minimum requirements of the "confined space entry procedure." Citation at 1–2; J.A. at 7–8.

The occupational hazard described by that language is clearly distinct from the one addressed by 29 C.F.R. § 1910.1000(a). While the regulation places a limit on the permissible level of time-weighted exposure to freon vapors over an eight-hour work shift, the hazard described in the citation is both broader and more specific than that described in the regulation. The citation refers to the danger, in confined spaces requiring special entry procedures, of short-term exposure to toxic vapors in concentrations that may displace oxygen. Given the facts alleged, the ALJ should have determined whether the description of the hazard was accurate; and if so, whether General Dynamics had knowledge of the hazard.

## E. *Commission Adherence to Precedent*

■ Petitioners offer the additional argument that the Commission's order is arbitrary and capricious because it departs from the Commission's decision in *Con Agra*. In that case the Secretary had issued a citation against a grain elevator company whose employees regularly entered grain-laden railroad cars containing pesticide fumes. Employees sometimes tested the air inside these cars by simply smelling for fumes, but the Secretary argued that certain pesticide vapors can cause serious harm at concentrations below those detectable by smell. The employer, Con Agra, Inc., argued that "there is nothing in the OSHA regulations that requires all grain cars to be tested, and that it was aware of and in compliance with section 1910.1000 threshold limits for air contaminants." *Id.* at 33,527. The ALJ granted Con Agra's motion to dismiss.

On review, the Commission adhered to the position that a specific standard preempts the general duty clause of the Act. It deemed that proposition irrelevant, however, and concluded that "failure to test in a confined atmosphere before possible exposure of employees to toxic substances is a violation distinct from a continued exposure to known quantities of substances listed in section 1910.1000." *Id.* It therefore held that the ALJ "erred in granting Con Agra's motion to dismiss at the close of the Secretary's case," vacated the ALJ's decision, and remanded the case. *Id.* at 33,528.

We cannot discern any material difference between the circumstances alleged in this case and those in *Con Agra*. According to the statutory charge, General Dynamics sent its employees into tanks, tank hulls, and assembly-line pits that contained solvent vapors. Con Agra sent its employees into railroad cars that contained pesticide fumes. Like Con Agra, General Dynamics argues that no reliable technical measurements show that its practices exposed its employees to fumes at concentrations higher than those prescribed by regulation. In *Con Agra*, the Commission deemed such an argument irrelevant because the employer had actual knowledge of the hazard faced by employees who entered contaminated railroad cars. In the instant case, the Secretary "strongly contends that the respondent had actual knowledge of the hazards associated with employee entry into confined spaces." ALJ decision at 9; J.A. at 116. In each case, there is no evidence that the contami-

nants exceeded the levels permitted by the specific standard.

Nor are we persuaded by the Commission's argument that this case is distinguishable from *Con Agra* because subsection 1910.1000(e) of the regulations adequately addresses the special measures required to safeguard employees working in confined spaces. That subsection mandates, *inter alia*, such "protective equipment or any other protective measures [necessary] to keep the exposure of employees to air contaminants within the limits prescribed." As the Secretary points out, however, the regulation is addressed not to the conditions here alleged, but to the measures that may be necessary to meet the time-weighted limits established by subsection 1910.1000(a). Reply Brief for Secretary at 8.

More fundamental, *Con Agra* cannot be so easily distinguished because its holding is not confined by a focus on the particular facts about challenged employer practices. Rather, *Con Agra* correctly makes the larger point that when an employer is aware of a hazard that is not in fact addressed by a specific standard, then of necessity that standard cannot be deemed to have preempted his obligation under the general duty clause. In this case the issue whether M–1 tanks, hulls, and assembly-line pits had been ventilated could be relevant to the outcome of a section 5(a)(1) adjudication, but not to whether such an adjudication need be made at all.

Thus we conclude that the Commission has failed to explain adequately why it did not follow its holding in *Con Agra*.

### III. CONCLUSION

We hold that that part of the Commission's final order vacating the statutory charge (1) is not in accordance with law because it impermissibly construes regulations in a manner unauthorized by the clear and unambiguous language of the Act, and (2) is arbitrary and capricious because it inadequately explains the Commission's failure to follow the holding of *Con Agra*. We therefore grant both petitions for review, vacate that part of the Commission's final order that vacates the section 5(a)(1) portion of the citation, and remand the cases to the Commission with instructions to address the merits of the section 5(a)(1) citation.

*It is so ordered.*